UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

CITY OF POUGHKEEPSIE, GLADYS LYLES,
and LISA CUMMINGS,

                            Plaintiffs,

             -against-

COUNTY OF DUTCHESS and
COUNTY EXECUTIVE SUE SERINO,

                    Defendants.

-----------------------------------------------------------------x

Case No. 25 Civ. 7668

**COMPLAINT AND
JURY DEMAND**

## INTRODUCTION

1.     Plaintiffs City of Poughkeepsie (the "City"), Gladys Lyles, and Lisa Cummings bring this case seeking injunctive relief to prevent Defendants County of Dutchess (the "County or "Dutchess County") and County Executive Sue Serino from exacerbating racial segregation in violation of federal and state fair housing laws by abruptly withdrawing from a long-planned compromise plan to combat homelessness and unilaterally directing that an emergency shelter be placed at 26 Oakley Street ("26 Oakley") in the Fifth Ward of the City of Poughkeepsie.

2.     Plaintiffs Gladys Lyles and Lisa Cummings (together, the "Individual Plaintiffs") are Black women who reside near 26 Oakley in the City of Poughkeepsie.  The City and the Individual Plaintiffs would be significantly harmed if the County were to proceed with its plan to place the shelter at 26 Oakley, including by the exacerbation of racial segregation, diminished property values, and other negative effects that the County's plan would impose on that disproportionately black neighborhood.

3.      Dutchess County, and the Poughkeepsie area in particular, has a long history of racial segregation.  For decades, the City of Poughkeepsie has been targeted with policies and practices that have resulted in harmful, extensive racial segregation and made it much more difficult for residents of the north side of the City (commonly known as the "Northside"), who are disproportionately Black, from economically thriving and a creating safe, secure, environmentally sound, and prosperous community.

4.      For decades, "redlining" practices resulted in mortgage lenders refusing to make loans in areas of the City where Black residents lived, particularly the Northside.  After IBM built a plant in the 1940s that brought economic prosperity to the *Town* of Poughkeepsie (which has a disproportionately white population compared to the City), residents of the Town successfully fought to maintain a separate school district from the City, resulting in stark disparities in educational opportunities between predominantly white Town residents and disproportionately Black City residents.  The construction of large arterial roads in the City in the 1960s and 70s – allowing outsiders to drive quickly through and around the City – not only destroyed numerous Black-owned homes within Northside neighborhoods, but also created physical barriers separating the Northside from the rest of the City, impeding economic development and racial integration.

5.      The County further exacerbated racial segregation when, despite immense opposition from the local community, the County built the Dutchess County jail in a predominantly Black section of the Northside of the City.  The County then expanded the jail twice, again over substantial opposition from the local community, in 1995 and 2023.  The presence of the County's jail has had substantial negative effects on the surrounding

neighborhood, including decreased housing values and residents experiencing people engaging in drug use, defecation, and public sex on or near their properties.

6.    In 2022, Dutchess County unilaterally decided to place a shelter for 120 single adults in the Fifth Ward, on the Northside, and informed the City in a letter that it was purchasing property at 26 Oakley Street for that purpose.  The Common Council of the City passed a unanimous resolution raising numerous concerns about the proposed placement of the emergency shelter on the Northside.  City officials and residents expressed serious concerns about the negative impacts that shelter placement would have on the Northside and the County's refusal to distribute services equitably throughout the region.

7.    Many in the City and the Northside community had been advocating for an alternate site, Hillcrest House, which is located on state-owned property in the Town of Poughkeepsie.  Unlike the Oakley site, it is not in a residential area.  The Hillcrest site housed a homeless shelter for over 20 years, including housing 60 single adults, until COVID safety concerns led to the emergency shelter being moved to a temporary site in the City.  The Hillcrest site is currently home to a transitional housing program.

8.    Beginning in 2024, representatives from the County and the City – including Defendant Serino and the City's Mayor, Yvonne Flowers – had extensive communications regarding the shelter over the course of many months.  They eventually reached an agreement in the spring of 2025 under which the County agreed not to move forward with the original plan to house 120 single adults in a shelter at 26 Oakley.  Instead, the City agreed to host a shelter for families and 20 single women at 26 Oakley, which reflected the City's willingness to continue playing a disproportionately large role in tackling homelessness in Dutchess County.  Defendant

Serino sent a Letter of Intent confirming the details of that agreement, but the City and County never executed a formal and final agreement.

9.      Instead, in early May 2025, Defendant Serino abruptly informed the City that Dutchess County would no longer support the agreement reflected in the Letter of Intent and would unilaterally insist on the shelter for single adults being placed at 26 Oakley.  The County has since insisted on placing the shelter at 26 Oakley, ignoring the significant concerns raised by the City and the affected communities as well as the compromise to which the County had agreed.

10.     The City and the Individual Plaintiffs bring this lawsuit seeking declaratory and injunctive relief to prevent the County from imposing its unilateral plan to place the shelter at 26 Oakley.  Dutchess County's plan will perpetuate segregation and will disproportionately and adversely impact Black communities in the City of Poughkeepsie.  It is plainly unlawful and must be enjoined.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 1343, and 2201; and pursuant to 42 U.S.C. § 3613.  This court has supplemental jurisdiction over Plaintiffs' state and local law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides, maintains offices, and conducts business in the district.

## JURY DEMAND

13.     Plaintiffs hereby demand a trial by jury.

## PARTIES

14.     Plaintiff City of Poughkeepsie (the "City") is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York.

15.     Plaintiff Gladys Lyles is a Black woman who resides in the Fifth Ward on the Northside in the City of Poughkeepsie, just around the corner from 26 Oakley.  Plaintiff Lyles worked most recently in special education and early interventions for preschool children until she retired.  She first moved to the Fifth Ward in the mid-1970s and, after living elsewhere for a period of time, has lived in her current home since 2005.  She owns her home through a trust.

16.     Plaintiff Lisa Cummings is a Black woman who resides in the Fifth Ward on the Northside in the City of Poughkeepsie, less than a quarter mile from 26 Oakley.  She works at a non-profit as a community rehabilitation specialist and is pursuing a certification as a peer support specialist to work with people with mental health challenges.  She has lived in the Fifth Ward since 1999 and in her current home, which she owns, since 2009.

17.     Defendant County of Dutchess is a political subdivision of the State of New York. At all times relevant hereto, the County was and remains responsible for formulating, proposing, promulgating, administering, and enforcing the policies and practices that are challenged in this action.

18.     Defendant Sue Serino is the County Executive of the County of Dutchess.  She is sued in her official capacity.  At all times relevant hereto, Defendant Serino was and remains responsible for administering and executing the laws and policies of the County.

## FACTS

### History of Segregation in Poughkeepsie

19.     The Poughkeepsie area has a long history of racial segregation.

20.     The Black population of the City was 888 in 1950 but increased to 5,876 by 1970. During that same period, the white population *decreased* by nearly 10,000.[1]

21.     For decades, the Northside of the City of Poughkeepsie has had a higher proportion of Black residents.  The Fifth Ward is a subdivision of the Northside.

22.     That area of the City has long been home to a thriving Black community.  For example, in 1858 Frederick Douglass delivered a pivotal speech urging the abolition of slavery before a crowd of thousands in the historic College Hill Park, which is just one short block from 26 Oakley.  The Northside has been home to countless trailblazing individuals in the century and a half since.

23.     But decades of policies and practices imposed by the County, the federal government, mortgage lenders, neighboring municipalities, and others have caused and exacerbated stark racial segregation in the area.

*Housing Ownership Segregated By Race*

24.     For decades, "redlining" practices – where private financial institutions refuse to provide services or loans at all to a community or neighborhood because it is predominantly Black, or refuse to provide services on the same beneficial terms as they provide to white communities – resulted in mortgage lenders refusing to make loans in areas of the City where Black residents lived, particularly the Northside.  For example, a 1938 map of the City prepared

---

[1] Aidan Antonienko, "Mapping Inequality: Redlining in New Deal America," University of Richmond, *available at* https://dsl.richmond.edu/panorama/redlining/map/NY/Poughkeepsie/context#loc=12/41.6906/-73.9055.

by the Federal Home Loan Bank Board divided the City into sections color-coded by their

"Grade," indicating the level of "risk" for mortgage lenders.

25.    As the map shows, the neighborhoods of the Northside were shaded yellow and

red, which actively discouraged lenders from making home loans in those neighborhoods and

later impeded Black Poughkeepsie residents from obtaining mortgages:[2]



---

*Schools Segregated By Race*

26.    In 1942, IBM built a plant in the Spackenkill area of the Town of Poughkeepsie, south of the City.  IBM offered company-owned housing to white workers but did not provide the same benefits to its Black employees.[3]  This resulted in the Spackenkill area of the Town becoming whiter and wealthier, but little of the wealth created by the plant benefitted Black residents in the City.  To the contrary, it actively undermined opportunities to Black residents of the City, and land values and population in the City declined.[4]

27.    In 1947, the New York State Education Department published a Master Plan calling for the consolidation of the Spackenkill Union Free School District and the Poughkeepsie City School District, and in the ensuing years offered financial incentives to the proposed combined district.

28.    But residents of the Spackenkill district vigorously opposed that consolidation, and after a prolonged public battle, Spackenkill *built its own separate high school* in the early 1970s.  The Spackenkill and Poughkeepsie school districts remain separate.

29.    The Spackenkill School District, which is funded by the tax base of the Spackenkill area of the Town of Poughkeepsie, is majority white (52%), with just 13% African-American students.  The Spackenkill district's academic performance has consistently been among the highest in Dutchess County and in the state.

30.    By contrast, the Poughkeepsie School District, which is funded by the tax base of the City, is just 4% white and 44% African American.  The Poughkeepsie School District has

---

[3] *Id.*
[4] *See* Tiana Headley, *A Tale of Two Districts: History of Poughkeepsie Schools*, The Miscellany News (Nov. 7, 2019), *available at* https://miscellanynews.org/2019/11/07/news/a-tale-of-two-districts-history-of-poughkeepsie-schools/.

made substantial improvements in recent years but continues to face challenges stemming from its limited resources.

*Infrastructure Developments Further Undermine and Isolate the Northside*

31.    The City engaged in "urban renewal" efforts in the second half of the 20th century, which had devastating effects on majority-Black neighborhoods such as the Northside.[5]

32.    The construction of the arterial roads in the City further contributed to the racial segregation of the City and placed hardship on Northside residents.[6]

33.    The North-South arterial road was built in the mid-1960s.

34.    When the plans for the East-West Arterial were proposed in the early 1970s, there was substantial opposition from communities concerned about the significant damage to neighborhoods, including the Northside, that it would cause.  Yet the plans proceeded, and the East-West Arterial roads were completed in 1979.

35.    The construction of the arterial roads destroyed many homes and businesses on the Northside of the City, predominantly owned by Black residents.  More fundamentally, the East-West Arterial physically divided the Northside from the rest of the City, isolating it by two three-lane, one-way roads with fast-traveling vehicles.[7]

36.    The three-lane arterial roads notably allow outsiders to pass quickly through the City and reach other County destinations, even as the same arterial roads narrow and become two-lanes when they pass through the Town or surrounding areas.

---

[5] *See* Harvey K. Flad, "A Time of Readjustment: Urban Renewal in Poughkeepsie, 1955-75," Dutchess County Historical Society Yearbook Vol 072 1987, *available at* https://issuu.com/dchsny/docs/dchs_yb_v072_1987_masterfile/s/15271841.
[6] *See* Kafui Attoh, "2: Infrastructure and the Tragedy of Development," *Infrastructuring Urban Futures* (Bristol University Press, 2023), *available at* https://bristoluniversitypressdigital.com/display/book/9781529225648/ch002.xml
[7] *Id.*

37.     As in many of other American cities, this physical isolation of a predominantly Black neighborhood by a major road furthered the racial segregation of the City.

*Dutchess County Further Burdens the Northside with Jail Placement and Expansions*

38.     In 1984, Dutchess County built the county jail on the Northside, on the border between the Fifth and Third Wards.

39.     In 1995, the County built an addition to the jail, over substantial protests from communities in the Northside and the City.

40.     And in 2023, the County completed yet another expansion of the jail.  The jail, now officially called the Dutchess County Justice & Transition Center, encompasses three large city blocks on the Northside.  Its presence has had substantial negative effects on the surrounding neighborhood.  Housing values have dropped, and residents have been subjected to people engaging in drug use, defecation, and public sex on or near their homes.

41.     The Dutchess County Jail's location on the Northside makes it virtually the only county jail in the state that is housed in a residential area of a city.

42.     Despite these many decades of segregative policies imposed on the City and the Northside by the County and others, the community has made substantial progress in revitalizing the area and increasing the safety, prosperity, and opportunities available to its residents.  The County's plan to place the shelter at 26 Oakley risks destabilizing efforts to continue that trajectory.

**Homelessness in Dutchess County**

43.    As in most areas of the United States and New York, Dutchess County has faced challenges of addressing homelessness and finding places for unhoused individuals to reside.

44.    The City of Poughkeepsie has long borne the lion's share of the burden of hosting shelters in the County.  The City constitutes only 10.4% of the County's population but has nearly forty percent of the total shelter beds.

45.    The Northside has a disproportionate concentration of shelter housing.  For instance, the Northside is home to nearly half of emergency housing beds in Dutchess County.  The Northside likewise houses a substantial portion of the County's transitional housing.

46.    Since 2020, the County has been using an emergency shelter called PODs to house up to 150 single adults.  The County placed the emergency PODs shelter next to the County jail, on the border of the Fifth and Third Wards on the Northside of the City.

47.    The presence of the PODs in that area has led to an aggregation of people in need of services and encouraged the creation of encampments of unhoused persons across the neighboring parts of the Northside.  The residents of the area – who are disproportionately Black – have been negatively impacted by the presence of the PODs.  For example, there have been numerous instances of people struggling with mental illness defecating and using intravenous and other substances on the properties of nearby residents.  The presence of the PODs, along with the jail, has reduced the property values and safety levels in the area.

**The City and the County Reach Agreement on a New Shelter**

48.    In 2022, the County declared, without seeking any input from the City, that it was placing yet another shelter, housing 120 single adults, in the Fifth Ward on the Northside of the City.

49.     On March 8, 2022, Marc Molinaro, who was the County Executive of Dutchess County at the time, sent a letter to the City's Corporation Counsel advising that the County "is purchasing the property located at 26 Oakley Street in the City of Poughkeepsie for the proposed purpose of developing an emergency housing facility for single adult individuals experiencing homelessness[.]"

50.     The letter asserted that the County believed it was not subject to the land use and zoning requirements of the City pursuant to the test set forth in *Matter of County of Monroe (City of Rochester)*, 72 N.Y.2d 338 (1988).

51.     Among other things, Molinaro asserted in the letter that the public interest would be served by the building of the shelter at 26 Oakley Street; that it would have "no adverse impact on legitimate local interests"; and that "a few other locations were considered" for the shelter but that "it was determined that, for several reasons, 26 Oakley would be the most suitable."

52.     After learning of the County's plans via the March 8, 2022, letter, the Common Council of the City passed a resolution on April 18, 2022 (by a vote of 8-0) raising numerous concerns about the proposed placement of the emergency shelter on the Northside.  The resolution directed the City to explore potential litigation regarding the County's proposal.

53.     Despite opposition from City residents and the full Common Council, Republican then-Mayor Rob Rolison vetoed the resolution on April 28, 2022.

54.     City officials and communities throughout the City, particularly on the Northside and in the Fifth Ward specifically, continued to express great concern about the negative impacts that placement of this shelter at 26 Oakley would have on those communities.

55.    As a recent photo taken from the parking lot of the 26 Oakley site shows, the proposed shelter would be located in a residential neighborhood, just steps away from homes:



56.    As another recent photo shows, multiple residential backyards abut the proposed shelter's parking lot, separated by two fences:



57.     Plaintiff Lyles's home is located in a residential area just feet away from 26 Oakley, on the other side of those fences.

58.     Plaintiff Cummings's home is located in a residential area just down the street from 26 Oakley, less than a quarter mile away.

**The County and the City Reach an Agreement to Place the Shelter Outside the City**

59.     From the beginning of the shelter placement process, many people advocated for a large complex called Hillcrest House ("Hillcrest") for the proposed shelter instead.  Hillcrest is a state-owned property in the Town of Poughkeepsie that is *not* in a residential area.  The Hillcrest site housed a homeless shelter for over 20 years, including housing 60 single adults, which was operated by Hudson River Housing.  In 2020, COVID safety concerns led to the shelter being moved on a temporary basis to the PODs site in the City, near the jail.  The Hillcrest site is currently home to a transitional housing program, as well as Webster House, which until 2020 was used for the County's emergency housing, both of which were operated by Hudson River Housing.

60.     Indeed, Hudson River Housing, which has been operating emergency housing in the City since 1982, indicated that it would not apply to operate the new proposed shelter if it were placed at 26 Oakley, because the County's "proposed actions do not align with the organization's mission and values, and because these actions also conflict with the valid concerns expressed by numerous City of Poughkeepsie residents."[8]  Instead, Hudson River Housing expressed that the shelter should be placed at a different site, such as Hillcrest.

---

[8] Saba Ali, *Hudson River Housing Opposes Dutchess County's Plan for Shelter in Poughkeepsie*, Poughkeepsie Journal (Aug. 25, 2023), *available at* https://www.poughkeepsiejournal.com/story/news/local/2023/08/24/hudson-river-housing-opposes-dutchess-countys-shelter-plan-poughkeepsie-ny/70655008007/.

61.     Some County legislators and residents from the Town of Poughkeepsie, however, opposed the return of the shelter for single adults to the Hillcrest site.

62.     Despite the availability of other sites such as Hillcrest – which had housed the shelter for single adults for 20 years – the County pushed forward with its unilateral plan to place the shelter at 26 Oakley.  The County applied for a grant from the New York State Office of Temporary and Disability Assistance, and was approved for a grant of $13,023,795 in 2024.

63.     Beginning in 2024, representatives from the County and the City – including Defendant Serino and the City's Mayor, Yvonne Flowers – had extensive communications regarding the shelter that the County had proposed for 26 Oakley.  Mayor Flowers conveyed repeatedly to Defendant Serino the serious concerns the City had about the County's proposal.  Defendant Serino and Mayor Flowers had numerous discussions, both in person and by phone, over the course of many months.

64.     Mayor Flowers consistently made clear that the City is committed to ensuring that unhoused individuals receive the services they need, but that the City has already been taking on far more than its share of the burden in doing so.  Mayor Flowers also made clear that the City was open to hosting a new shelter for families and/or single women.

65.     When the County was approved for the $13 million state grant in 2024, the County Spokesperson stated that the "funding is specific to the Oakley Street location and cannot be transferred to an alternate location," but "she added that the county executive has reached out to New York Gov. Kathy Hochul's office to see if there is flexibility regarding alternative locations and 'if there is an opportunity to work with the State to consider state-owned property as an alternative.  The Governor's office is facilitating meetings to discuss.'"  The County

Spokesperson further said, "We look forward to discussing all opportunities on that expansive state-owned former hospital campus/property" in reference to Hillcrest site.[9]

66.    Defendant Serino and Mayor Flowers reached an agreement in the spring of 2025 under which the County agreed not to move forward with the proposed shelter at 26 Oakley. Instead, the County agreed that any shelter it placed at 26 Oakley in the next 40 years would only be for single women or families, and that it would not place any other new shelter in the City in the next 25 years.

67.    Defendant Serino indicated that the County would agree to instead place the proposed emergency shelter at a different location, outside the City.

68.    In February 2025, the County sent a proposed Letter of Intent to the City reflecting the County's proposal for an agreement.  On February 18, 2025, the City's Common Council unanimously passed a resolution authorizing the Mayor to propose certain changes to the Letter of Intent and to sign the Letter of Intent if the County agreed to those edits.  Mayor Flowers signed the resolution the following day.

69.    The County agreed to the edits the City proposed to the Letter of Intent.  On April 11, 2025, Defendant Serino sent Mayor Flowers a final Letter of Intent that "set[] forth a preliminary understanding" between the County and the City regarding the County's use of the property at 26 Oakley.

70.    The Letter of Intent describes an agreement that the County would not, for at least 25 years into the future, construct, develop, or directly operate any new emergency shelter within the municipal boundaries of the City.

---

[9] Saba Ali, *NY Awarded $13 Million for Poughkeepsie Shelter. Why It Might Not Be Happening*, Poughkeepsie Journal (April 15, 2024), *available at* https://www.poughkeepsiejournal.com/story/news/local/2024/04/15/poughkeepsie-shelter-project-latest-ny-awards-13-million/73287257007/.

71.     The agreement further provided that, for a period of no less than 25 years into the future, if the County operates a shelter for the homeless at the 26 Oakley location, it shall only be a shelter for housing up to 20 single women (pursuant to 18 NYCRR Part 491) and/or a family shelter (pursuant to 18 NYCRR Part 900), and that such shelter shall include personnel responsible for internal shelter security.  The agreement further provided that for the subsequent 15 years (i.e., from 25 to 40 years in the future), any County-operated shelter at 26 Oakley shall only be a family shelter (pursuant to 18 NYCRR Part 900) or a shelter for single women (pursuant to 18 NYCRR Part 491), with no cap on the number of women in such shelter.

72.     The Letter of Intent indicated that the County and the City intended to execute a formal and final agreement within 30 days.

73.     In sum, the City and the County had reached an agreement in which the City would continue to further its efforts to assist unhoused people and tackle the problems of homelessness, by housing families and single women at 26 Oakley, but that the 120-bed emergency shelter for single adults would not be placed in the City.

74.     That agreement would address the needs of unhoused individuals while also reducing segregation in the greater Poughkeepsie area and the County.  The likely demographic makeup of the residents of the emergency shelter for single adults contains a higher proportion of Black individuals, and lower proportion of White individuals, than the Town of Poughkeepsie, where Hillcrest is located.  The placement of that shelter at Hillcrest would make the Town of Poughkeepsie, and the overall area, more integrated.  At the same time, the City's agreement to host a shelter for families and single women at 26 Oakley reflected the City's willingness to continue playing a central, and disproportionately large, role in tackling homelessness in Dutchess County.

75.    The County and the City never executed a formal and final agreement following the Letter of Intent.  Instead, in early May 2025, Defendant Serino abruptly informed the City that the County would no longer support the agreement that was reflected in the Letter of Intent and would unilaterally insist on the shelter for single adults being placed at 26 Oakley. Defendant Serino expressed to the City that this abrupt about-face was because she believed that members of the County Legislature would not support the agreement to place the shelter outside the City of Poughkeepsie.

76.    Notably, at the same time that it reversed course and pushed a plan that would further racial segregation and harm the Northside by placing the shelter at 26 Oakley, the County had no problem ignoring its contractual obligations and available grant funding by putting on indefinite hold the plans it announced in 2020 to build a Youth Opportunity Union in the City of Poughkeepsie.  Announced in 2020, the Youth Opportunity Union was to occupy the plot of a vacant former YMCA building, and provide "an elaborate community center in the heart of the city" – "a place kids and adults could learn to swim, cook, scale a rock wall, attend theater and receive child care."[10]  The County received millions in state and federal grants for the project, but failed to allocate the promised funds to implement the project, and Dutchess County and Defendant Serino reallocated the money to general County education initiatives in July 2024. The County was also awarded a $10 million state grant for swimming facilities at the Youth Opportunity Union in 2024, which it has apparently been willing to simply forgo and thus deprive families in the City of the prospective benefits.  The YMCA has now been torn down, but an empty lot remains, and the Youth Opportunity Union project remains in limbo.

---

[10] Lana Bellamy, *How a $165 Million Youth Community Center in Poughkeepsie Stalled*, Times Union (July 8, 2025), *available at* https://www.timesunion.com/hudsonvalley/news/article/youth-opportunity-union-project-report-20400466.php.

77.     In short, even as Dutchess County refused to implement allotted grants for the City's improvement through a youth center – taking the funds and reallocating them for the County – it actively insists on imposing a large homeless shelter, exacerbating racial segregation over residents' active objections.

78.     The County's decision to unilaterally push for the shelter on Oakley Street while leaving the Youth Opportunity Union in limbo has sent a clear and disheartening message to the City and its communities about the County's priorities.  For Dutchess County, the City of Poughkeepsie is not a community of individuals worthy of opportunity and growth, but a dumping ground for anything the County perceives as problematic and difficult.

**The County's Plan to Place the Shelter at 26 Oakley Would Further Segregation and Disparately Impact Plaintiffs and the City's Black Communities**

79.     Dutchess County, the Poughkeepsie area, and the City of Poughkeepsie remain highly segregated, with clear housing patterns based on race.

80.     According to 2020 Census Data, 37% of the City of Poughkeepsie's residents are Black, while 37% are white and 23% are Hispanic or Latino of any race.  By contrast, residents of the Town of Poughkeepsie are just 12% Black, 65% white, and 15% Hispanic or Latino of any race.  Dutchess County residents overall are 11% Black, 70% white, and 14% Hispanic or Latino of any race.

81.     Poverty in Dutchess County continues to affect Black and Hispanic residents at much higher rates.  According to the American Community Survey, 17% of Black and 12% of Hispanic residents of Dutchess County are living in poverty, compared with just 6% of white residents.  These numbers are just as stark in the City of Poughkeepsie, where 25% of Black residents, 19% of Hispanic residents, and 11% of white residents are living in poverty.

82.     Among all races, approximately 18% of residents of the City of Poughkeepsie are living in poverty, compared with just 8% of residents of the Town of Poughkeepsie and just 8% of Dutchess County residents overall.

83.     Estimates of the demographic makeup of unhoused persons in Dutchess County show that population to be disproportionately Black and Latino, and less white, than the county population.  The 2025 Point-in-Time Count data from Cares of NY, Inc. indicated that approximately 44% of the overall unhoused population in Dutchess County was white, 42% was Black, and 21% was Hispanic or Latino of any race.[11]

84.     The County's plan to place the shelter within the City of Poughkeepsie, and at 26 Oakley specifically, would increase, reinforce, and perpetuate segregation in Dutchess County, the Poughkeepsie area, and within the City of Poughkeepsie.

85.     The County's plan will result in increasing the concentration of Dutchess County's Black residents within the City of Poughkeepsie, and in the Fifth Ward and the Northside of the City specifically.  As noted above, the City of Poughkeepsie already has a much higher proportion of Black residents than the County, and the Fifth Ward and Northside areas of the City have even higher proportions of Black residents.

86.     The likely population of the proposed shelter, based on the Point-in-Time Counts from 2025 and other recent years, has a higher proportion of Black individuals than the City of Poughkeepsie, and a much higher proportion than the County overall.[12]

87.     The County's plan also impedes the reduction in segregation that would result if the shelter were instead placed in the available alternative location in the Town of Poughkeepsie,

---

[11] Cares of NY, Inc., 2025 Point-in-Time Count NY-601 Poughkeepsie/Dutchess County CoC, *available at* https://caresny.org/wp-content/uploads/2025/06/NY-601-HDX2-PIT-Data.pdf.
[12] The Point-in-Time Count data for prior years is available at https://caresny.org/continuum-of-care/reports/#DCCoC.

as the proportion of Town residents who are Black is much lower than the proportion of the expected population of the shelter, or of the City.

88.     The County's prior actions, including the placement and repeated expansion of the jail, had already caused and exacerbated segregation in the City, and in the Northside and Fifth Ward specifically.

89.     The County's plan for 26 Oakley would cause a significantly adverse and disproportionate negative impact on Black residents of the City, and in particular on the Black communities of the Northside that surround 26 Oakley, of which Plaintiff Lyles and Plaintiff Cummings are a part.

90.     The placement of the shelter at 26 Oakley would disproportionately harm those communities and Individual Plaintiffs in a variety of ways, including by furthering segregation and preventing integration in the area, by causing the property values of residents' homes to decrease, and by otherwise harming their social and economic welfare.

**Placing the Shelter at 26 Oakley Would Harm Plaintiffs**

91.     The City would suffer concrete injury as a direct result of the County's proposed shelter plan.

92.     The County plan would further and increase racial segregation in the City and in the surrounding area, which the City has a strong interest in avoiding.  The County plan would interfere with the City's goal of promoting stable, racially integrated housing.

93.     The County plan would harm the City's ability to comply with its obligation to Affirmatively Further Fair Housing, and would violate the County's obligation to Affirmatively Further Fair Housing.

21

94.     The County plan would decrease the property values on the Northside, which would result in a reduction in the City's property tax revenues.

95.     The County plan would harm the economic and social welfare of the City's residents, and cause other economic and social harms that flow from entrenching segregation.

96.     Plaintiff Lyles would be harmed in a variety of ways by the County plan, including by being subjected to increased segregation, being deprived of the opportunity to live in an integrated area, and by the property value of her home decreasing, and by her economic and social welfare otherwise being harmed.  Plaintiff Lyles is highly concerned that the neighborhood is already struggling and that its safety and wellbeing would decrease significantly if the County plan were to proceed.  For example, she is concerned that putting a shelter for single adults at 26 Oakley would cause an increase in individuals using drugs, defecating, and leaving needles and garbage on and near her property and that it would reduce property values in her neighborhood and negatively impact the ability of the neighborhood to make social and economic progress.

97.     Plaintiff Cummings would be harmed in a variety of ways by the County plan, including by being subjected to increased segregation, being deprived of the opportunity to live in an integrated area, and by the property value of her home decreasing, and by her economic and social welfare otherwise being harmed.  Plaintiff Cummings has experienced an increase in safety issues in her neighborhood in the last few years, and she is highly concerned that the safety and wellbeing of the neighborhood would further decrease if the shelter for single adults were placed at 26 Oakley.  Indeed, Plaintiff Cummings has recently consulted with real estate professionals to consider plans to potentially move away from the vicinity of 26 Oakley if the County plan proceeds.

**Less Discriminatory Alternative Sites for the Shelter Are Available**

98.     The purposes that the County seeks to further with the proposed shelter could be served by an alternate plan that has a less discriminatory effect – namely, by placing the shelter in a different location that will not further segregation in the City.

99.     The Hillcrest site, in the Town of Poughkeepsie, would satisfy all of the needs and requirements for the shelter that the County seeks to build.

100.    Placing the shelter at Hillcrest would not further segregation, but would in fact encourage the integration of the Poughkeepsie area.

101.    The Hillcrest site is accessible to public transportation.  It is a six-minute walk to a bus stop, which runs directly to downtown Poughkeepsie.  The County operates that bus service.

102.    In proposing to put the shelter at 26 Oakley, the County and Defendant Serino have repeatedly indicated that they are seeking to follow the model of Bergen County, New Jersey with respect to locating case management, mental health and substance use services, job training, and individualized independent living plan services at the same site as the shelter.[13]  But the Hillcrest site would make far more sense in this regard since it could host all of those services on-site.  Moreover, the County's claim that 26 Oakley is the best site due to its proximity to existing services is neither logical nor credible given the County's stated plan to house relevant services for residents of the shelter on-site.

103.    On information and belief, there are other sites throughout Dutchess County that are also less discriminatory than 26 Oakley.  For example, community leaders and elected

---

[13] *See, e.g.*, Dutchess County Executive, "Serino Announces County Will Move Forward with Supportive Housing for Single Adults at Oakley Street" (May 7, 2025), *available at* https://www.dutchessny.gov/Departments/County-Executive/Serino-Announces-County-Will-Move-Forward-Oakley-Street.html.

23

officials provided the County with a list of numerous possible sites for the shelter that would

have a lesser impact on the surrounding community than 26 Oakley would.  But the County

refused even to consider some of those sites, in part due to the County's insistence that the

shelter be located within five miles of Downtown Poughkeepsie due to the location of existing

social service providers.  This proximity requirement is irrational given the plan for the new

shelter to include social services on-site (as well as the availability of County-run bus

transportation).  And the proximity requirement furthers segregation by requiring that

disproportionately Black areas of the City must host the emergency shelter on the basis that they

already house a disproportionate portion of social services sites.

104.    Indeed, another parameter the County identified in considering various potential

sites for the shelter was "[i]deally, not a primarily residential neighborhood" – but the County

has ignored that parameter, and the corresponding negative effects on the residents of the Fifth

Ward, in pushing forward its plan.

### FIRST CAUSE OF ACTION
Violations of the Fair Housing Act, 42 U.S.C. § 3604
On Behalf of All Plaintiffs

105.    Each of the foregoing paragraphs is hereby repeated and incorporated by

reference as if fully set forth herein.

106.    The County's plan to place the shelter at 26 Oakley constitutes unlawful

discrimination because of race in violation of the Fair Housing Act, 42 U.S.C. § 3604.

107.    The County's plan intentionally discriminates because of race.  Dutchess County's

plan constitutes intentional discrimination as its decisions to implement the plan:  (a) were made

in the face of a history of discrimination and segregation encouraged by and participated in by

the County; (b) were made knowing, or being deliberatively indifferent to, the plan's clear

disparate impact on and its tendency to perpetuate segregation; (c) constitutes a choice to reject a more pro-integrative alternative; and on information and belief, (d) responded to racially- and ethnically-influenced community and political opposition by Town residents and County legislators representing the Town.

108.    The County's plan would increase, reinforce, and perpetuate segregated housing patterns because of race within Dutchess County, within the Poughkeepsie area, and within the City of Poughkeepsie.

109.    In planning for the shelter site, Defendants have made a series of policy decisions over the course of three years in their deliberations to select the 26 Oakley site for the shelter over Hillcrest or other alternatives.

110.    Defendants' policy would have a disparate impact on the Individual Plaintiffs and on the Black communities of the Fifth Ward, the Northside, and throughout the City of Poughkeepsie.

111.    As a result of the County's acts and omissions, the City has and will continue to suffer injuries.

112.    As a result of the County's acts and omissions, the Individual Plaintiffs have and will continue to suffer injuries.  Defendants have impinged on their right to live in an integrated neighborhood.

**<u>SECOND CAUSE OF ACTION</u>**
Violations of the New York State Executive Law
On Behalf of All Plaintiffs

113.    Each of the foregoing paragraphs is hereby repeated and incorporated by reference as if fully set forth herein.

114.    The County's plan to place the shelter at 26 Oakley Street constitutes unlawful race discrimination in violation of § 296 of the New York State Executive Law.

115.    The County's plan intentionally discriminates because of race; would increase, reinforce, and perpetuate segregated housing patterns because of race; and would have a disparate impact on the Individual Plaintiffs and on the Black communities of the Fifth Ward, the Northside, and throughout the City of Poughkeepsie.

116.    As a result of the County's acts and omissions, the City and the Individual Plaintiffs have and will continue to suffer injuries.

### THIRD CAUSE OF ACTION
Violation of City of Poughkeepsie Zoning Laws
On Behalf of Plaintiff City of Poughkeepsie

117.    Each of the foregoing paragraphs is hereby repeated and incorporated by reference as if fully set forth herein.

118.    Pursuant to the City of Poughkeepsie Code of Ordinances, 26 Oakley is designated as part of a "Research and Development District," the permitted uses of which are set forth in Section 19-3.31(2) of the Code of Ordinances.

119.    The use of 26 Oakley as a shelter in the manner proposed by the County is not permitted in a Research and Development District.  In the alternative, even if the County's proposed use could be permitted in any circumstance under the City zoning laws, it would at a minimum require the grant of a special permit and site plan approval by the City's Planning Board, which has not been sought or obtained.

120.    Pursuant to the factors set forth in *Matter of County of Monroe (City of Rochester)*, 72 N.Y.2d 338 (1988), the County is not immune to the City's zoning laws with respect to the proposed shelter.

121.    For example, the public interest, and the City's legitimate local interests, strongly disfavor the County's proposal, including because it would unlawfully further racial segregation and would disproportionately harm Black residents of the Fifth Ward, the Northside, and throughout the City.

122.    Likewise, there are readily available alternative means for the County to achieve the purposes of the proposed shelter – including by placing it at the Hillcrest site in the Town of Poughkeepsie.

123.    The County's Plan would thus violate the City of Poughkeepsie's zoning laws.


WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

a.    Declare, pursuant to 28 U.S.C. §2201, that the County's plan to build the shelter at 26 Oakley Street would violate the Fair Housing Act, 42 U.S.C. § 3604, section 296 of the New York Executive Law, and City of Poughkeepsie zoning laws;

b.    Temporarily, preliminarily, and permanently enjoining Defendants from engaging in unlawful discrimination, including without limitation by prohibiting Defendants from taking any actions to place a shelter at 26 Oakley Street in the City of Poughkeepsie;

c.    Awarding Plaintiffs attorneys' fees and costs pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(2) and the New York Executive Law § 297(10);

d.    Awarding such other and further relief as this Court deems just, proper, and equitable.

DATED:   New York, New York            Respectfully submitted,
           September 16, 2025
                                   WANG HECKER LLP


                                   By: /s/ Daniel Mullkoff
                                      Mariann Meier Wang
                                      Daniel Mullkoff
                                      Lily Sawyer-Kaplan
                                      111 Broadway, Suite 1406
                                      New York, New York 10006
                                      (212) 620-2606

                                   *Attorneys for Plaintiffs*